IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Debra Klein, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 10 C 2725 |
| v. | ) | |
| | ) | The Honorable William J. Hibbler |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Debra Klein applied for disability insurance benefits and supplemental security income under

the Social Security Act, 42 U.S.C. § 416(I), 423, 1382. The Social Security Administration denied

Klein's application at all stages of its review and Klein seeks judicial review of the Administrative

Law Judge's decision. 42 U.S.C. § 405(g), 1383(c)(2).

Klein alleges that her fibromyalgia coupled with lingering pain from the tear of her anterior

cruciate ligament made her disabled as of November 1, 2007. After her claims were denied, Klein

requested a hearing, which was held in November 2008. Administrative Law Judge Edward Pappert

issued a decision denying benefits in March 2009. (Tr. 9-24). Klein's request for an administrative

appeal was denied.

Klein has seen Dr. Lisa Newman since 1999. (Tr. 519). During that time, Dr. Newman has

managed symptoms caused by Klein's fibromyalgia. (Tr. 262-63, 404-424, 446-47, 451-52, 518-26,

630-40). Klein reported to Dr. Newman that she had been diagnosed with fibromyalgia at the age

1

of 18. Among other things, Dr. Newman reports that there are few medical treatments for fibromyalgia and that Klein does not tolerate the most commonly prescribed medication for it. (Tr. 199). Dr. Newman recommended exercise to Klein to combat the symptoms of her fibromyalgia. (Tr. 199, 421). In addition, Dr. Newman's treatment notes suggest that valium helped relieve the symptoms of Klein's fibromyalgia. (Tr. 418-19). Dr. Newman's notes suggest that valium both reduced spasming and helped Klein to sleep. (Tr. 418-19).

In June 2007, Klein tore her anterior cruciate ligament in her right knee while mud-wrestling with her brother-in-law. (Tr. 275). Initially, she treated the ACL tear conservatively by attending physical therapy, but ultimately had surgery in August 2007 to repair the tear. (Tr. 275-91). In November 2007, Klein slipped twice, aggravating the then-healing knee. (Tr. 242, 246). The condition of Klein's knee worsened after the falls and she required a second surgery in March 2008 (Tr. 386, 439, 549-50). During physical therapy treatment for her knee in 2007 and 2008, Klein complained repeatedly of pain associated with flaring up of her fibromyalgia. (Tr. 204, 328, 349, 506).

Dr. Newman's treatment notes, though sparse, reveal consistent attention to symptoms caused by fibromyalgia. Dr. Newman's records suggest that Klein's fibromyalgia has worsened after the knee injury. (Tr. 421, 423). Among other things, Klein reported a loss of night-time vision. (Tr. 419, 421). Further, Dr. Newman's notes reveal that the pain in Klein's shoulder and neck and the numbness in Klein's had increased. (Tr. 423).

In support of Klein's application for benefits, Dr. Newman completed an "arthritic report" in March 2008 that was submitted to the Bureau of Disability Determination Services. Dr. Newman detailed the symptoms caused by Klein's fibromyalgia. In that report, Dr. Newman noted that Klein

suffered from fatigue and malaise, was unable to reach with her arms past 90 degrees, had trouble grasping, turning or twisting objects and could not open bottles and dropped drinks or keys, often feels off balance when walking and frequently had her knee give out, and becomes stiff after 10-15 minutes of sitting. (Tr. 404-05). According to Dr. Newman, if Klein were working she would need to shift positions or stretch every 20 minutes. (Tr. 405). Further, Dr. Newman noted numbness in distal fingers at the palmer aspect of her hands and a decrease in range of movement in her arms and legs, most particularly in her right hip and knee. (Tr. 407). In May 2008, Dr. Newman supplemented the March 2008 report with a brief letter in which she opined that Klein's fibromyalgia caused chronic fatigue and malaise, decreased function in her arms, and difficulty with hand grasp. (Tr. 452).

In July 2008, Dr. Newman completed a "multiple-impairment questionnaire" that assessed Klein's ability to work. In that questionnaire, Dr. Newman noted that her prognosis of Klein's fibromyalgia was "fair" but "chronic." (Tr. 519). She noted decreased tactile sensation in distal fingers and toes and decreased overall muscle strength based on a March 2008 examination. (Tr. 519). Dr. Newman described Klein's pain as 7 on a 10-point scale and her fatigue as a 5 on a similar 10-point scale, and noted the frequency of the pain was constant. (Tr. 521). Dr. Newman again noted that Klein had participated in physical therapy and tried to remain active despite the pain, which was "one of the few things that has been shown to help fibromyalgia." (Tr. 521).

Based on these findings, Dr. Newman believed that Klein could sit for no more than 3 hours in an 8-hour day and stand for no more than 3 hours in an 8-hour day, with frequent changes of position and breaks. (Tr. at 521). Dr. Newman further opined that Klein could only occasionally lift up to 10 pounds, had moderate restrictions on grasping, twisting or turning objects, and was

precluded from reaching or stretching for objects (Tr. 522-23). She noted only minimal restrictions on Klein's ability to use fine manipulations. (Tr. 523). Dr. Newman believed that Klein's condition would worsen if she were placed in competitive work environment. (Tr. 523). Dr. Newman noted that Klein's pain and fatigue would frequently affect her concentration and that she would need a few unscheduled breaks every hour to remain productive. (Tr. 524).

In addition to Dr. Newman's assessment and treatment records, the ALJ received the a Residual Functional Capacity Assessment (RFCA) from an agency physician, Dr. Frank Jimenez, who reviewed Klein's medical records. Dr. Jimenez's evaluation differed only marginally from Dr. Newman's assessment. Dr. Jimenez believed that Klein could occasionally lift up to 20 pounds and frequently lift 10 pounds. (Tr. 430). He believed Klein could stand for up to six hours in a normal workday and sit for up to six hours in a normal workday. (Tr. 430). He noted that Klein's fibromyalgia caused pain, tenderness, stiffness and fatigue. (Tr. 430). Although Dr. Jimenez checked the box for "no limitations" with regard to manipulations, immediately thereafter he commented that she had some limitation in reaching and handling due to "fatigue and weakness." (Tr. 432). Later, Dr. Jimenez wrote Klein had "problems with fine and gross manipulation." (Tr. 436). Dr. Jimenez concluded that Klein was credible, her condition was supported by the medical evidence, and that her fibromyalgia causes fatigue and weakness. (Tr. 436). Dr. Jimenez provided little by way of explanation for his conclusions. In fact, much of the time, he merely checked a box on the RFCA form.

Klein testified before the ALJ in November 2008. Klein testified that her work history was limited because of her fibromyalgia. (Tr. 32-33). In particular, she testified that she had been let go from a waitress position because she had dropped too many things and that she quit a part-time job

4

as a crossing guard because she felt she was endangering children. (Tr. 33). With regard to her daily activities, Klein testified about the limitations her fibromyalgia placed upon her. For example, she testified that she did not drive for more than 10 miles because her vision gets blurry, she cramps up, and it is hard for her to check behind her shoulder. (Tr. 34). She testified that her husband helps with most chores, that she could not hold or lift the laundry, put away dishes due to her inability to reach, or take things out of the oven. (Tr. 34-35). Klein testified that she spends her time reading, stretching, occasionally walking, or attending physical therapy. (Tr. 33-35). With regard to symptoms of fibromyalgia, Klein testified that she experiences pain in her arms, neck, shoulders, back, head, and hands. (Tr. 36). Klein further testified that she has numbness in her thumb and fingers. (Tr. 36). Klein testified that she took Vicodin, Cymbalta, and Levothyroxine (a steroid) to combat the symptoms of her fibromyalgia. (Tr. 37-38).

After Klein testified, the ALJ questioned a vocational expert. The vocational expert testified that a person who can lift and carry ten pounds occasionally, use her hands frequently for grasping or fine manipulations, required the ability to sit or stand at will but could maintain a position for 50 minutes to an hour would be capable of performing the jobs of sorter or bench assembler. (Tr. 46). Klein's counsel supplemented the ALJ's hypothetical by including a limitation on grasping and fine manipulation and the vocational expert testified that the person would not be capable of performing any job in significant numbers in the economy. (Tr. 47). Counsel also posed a hypothetical about a person who could sit for no more than 3 hours and stand for no more than 3 hours in a work day. The vocational expert testified that the person would not be capable of performing any job in significant numbers in the economy. (Tr. 49).

The ALJ proceeded through the standard five-step inquiry to determine whether Klein was

5

disabled. *See* 20 C.F.R. 404.1520. The ALJ found that Klein had not engaged in substantial gainful activity since November 1, 2007. The ALJ further found that Klein suffered from fibromyalgia, arthritis, a torn knee ligament, neck, shoulder, and arm pain, but that these ailments did not meet or equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Accordingly, the ALJ assessed Klein's residual functional capacity (RFC) and found that she could lift and carry 10 pounds occasionally, 5 pounds frequently, occasionally stoop, crouch, or kneel, could not work around dangerous moving machinery or in any situation were loss of coordination or balance would pose a threat to herself or others, could use her hands frequently for grasping and fine manipulation, required the ability to sit or stand at will but could sit for 50 minutes to an hour. Based on the ALJ's RFC assessment and the vocational expert's testimony, the ALJ found that Klein was not disabled.

When reviewing the findings of the ALJ, courts are not free to replace the ALJ's assessment of the medical evidence with its own. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Instead, courts ask only whether substantial evidence supports the ALJ's conclusions. *Id.* Substantial evidence supports an ALJ's conclusion if the "decision rests on 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). An ALJ must rest the denial of benefits on adequate evidence and explain why contrary evidence does not persuade. *Id.*

The ALJ's decision rests on two principle determinations, namely that: (1) Klein's treating physician's opinion was due less weight than the opinion of the agency physician; and (2) Klein exaggerated the symptoms of her condition. Neither determination is supported by substantial evidence.

The ALJ discounted the opinion of Dr. Newman, Klein's treating physician and instead

credited the opinion of the agency physician, Dr. Jimenez. A treating physician's opinion that is generally consistent with the record is entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). An ALJ who chooses to reject a treating physician's opinion must provide sound reasoning for the rejection. 20 C.F. R. § 404.1527(d)(2); *Jelinek*, 662 F.3d at 811. Furthermore, when an ALJ decides to favor another medical professional's opinion over a treating physician, the ALJ must provide an account of what value the treating physician's opinion merits. *Jelinek*, 662 F.3d at 811.

In this case, the ALJ rejected Dr. Newman's opinion on three grounds. First, the ALJ stated that Dr. Jimenez had "extensive knowledge of disability requirements" and so gave his opinion "significant weight." Second, the ALJ noted that Dr. Newman's opinion is not well supported by medical evidence or any clinical testing. Third, the ALJ noted that Dr. Newman "had inconsistencies" in her opinion regarding Klein's limitations.

The mere fact that Dr. Jimenez's opinion conflicted with Dr. Newman's is not reason to credit Dr. Jimenez's opinion over Dr. Newman's. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). Dr. Jimenez's familiarity with the disability regulations, in itself, cannot be a sufficient basis to prefer his opinion over a treating physician's opinion. Otherwise, the presumption that a treating physician's opinion is entitled to controlling weight would vanish, for agency physicians by the nature of their position will always have more familiarity with disability regulations than treating physicians. While the familiarity with disability regulations is a factor to be considered when assessing how much weight to give a medical opinion, 20 C.F.R. § 404.1527(d)(6), it is but one of several factors that an ALJ must consider before rejecting a treating physician's opinion.

The ALJ's suggestion that Dr. Newman's opinion is not well supported by the medical

evidence is simply wrong. The medical records demonstrate that Klein took extensive medication to combat the symptoms of her fibromyalgia. The ALJ never discusses this medication in his conclusion that Dr. Newman's opinion is not supported by the medical record. The ALJ further seems to suggest that because the doctor who treated Klein's torn knee ligament did not discuss her fibromyalgia that Dr. Newman's assessment is unsupported by medical evidence. Klein's physical therapy records, however, are replete with evidence that Klein's fibromyalgia was in fact interfering with her physical therapy. (Tr. 204, 328, 349, 506). Finally, the ALJ seems to discount Dr. Newman's opinion because he believed there was "no evidence" that Dr. Newman "conducted the 18-point trigger check commonly associated with fibromyalgia." This conclusion is simply wrong. While Dr. Newman did not include any results of an 18-point trigger check in her written opinions, Klein testified that Dr. Newman had performed the trigger check, most recently a week before the hearing. (Tr. 36-37). Although Klein did testify that Dr. Newman may not have done a full 18-point trigger check at the most recent check, the ALJ never followed up with Klein's response. In fact, when the ALJ asked Klein what the results of the check were, he cut off Klein's response and immediately moved to an entirely different line of questioning. It is also clear from Klein's response that she described only the "most recent[]" trigger check test performed by Dr. Newman, implying that Dr. Newman or other doctors had performed such tests previously. (Tr. 36-37). Quite simply, the ALJ left the record undeveloped, without discussing the results of the most recent trigger check test. Instead of developing the record, the ALJ speculated that Dr. Newman had never performed such a test. An ALJ's conjecture is never a reason for ignoring a treating physician's views. *Moss*, 555 F.3d at 560-61.

Finally, the ALJ chose to disregard Dr. Newman's opinion because he believed it to be

internally inconsistent. This conclusion is patently wrong. In explaining the perceived inconsistency, the ALJ stated that Dr. Newman opined in March 2008 that Klein was "unlimited" with regard to manipulative limitations and opined in July 2008 that she had difficulty with hand grasp and fine motor skills. At best, the ALJ mischaracterizes Dr. Newman's opinions. In March 2008, Dr. Newman in fact noted that Klein had trouble grasping, turning or twisting objects. In fact, Dr. Newman gave specific examples, pointing out that Klein was "unable to open bottles, drops drinks [and] keys" and that she had "numbness in distal fingers." In Dr. Newman's July 2008 report, she reported decreased tactile sensation in her distal fingers, that she had moderate limitations in grasping, turning or twisting objects, and only minimal limitations in fine manipulations. These reports are hardly inconsistent. Rather, it seems that in order to find an inconsistency the ALJ has conflated two distinct categories of motor skills: (1) "grasping, twisting and turning"; and (2) "fine manipulations."

Quite simply, the ALJ has provided no good reason to discount Dr. Newman's opinion in favor of a non-treating physician. Even if the ALJ had provided good reason for not giving Dr. Newman's opinion controlling weight, the regulations require that the ALJ determine what value her opinion did merit. 20 C.F.R. § 404.1527(d)(2); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). This requires an ALJ to consider the length, nature, and extent of the treating physician's relationship with the claimant, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion. 20 C.F.R. § 404.1527(d)(2); *Scott*, 647 F.3d at 740. Merely stating that Dr. Newman's opinion is entitled to "substantial weight," but was "partially discounted" is not sufficient to enable this Court to determine what, if anything, the ALJ did draw from Dr. Newman's opinion. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010)

(noting that ALJ opinion giving "some weight" to treating physician's opinion was "unhelpful."). Indeed, the ALJ never discussed Dr. Newman's belief that Klein could sit for only 3 hours per workday or stand for only 3 hours per workday, focusing instead only on the "inconsistency" concerning Klein's motor skills.[1] Further, the ALJ never discussed Dr. Newman's assessment that Klein suffered from fatigue as a symptom of her fibromyalgia. These two deficiencies further demonstrate the wholesale failure to comply with 20 C.F.R.§ 404.1527(d)(2).

The ALJ's failure to build a logical bridge between his conclusion that Dr. Newman's opinion was not entitled to controlling weight is itself reason to remand the case for further proceedings. However, the ALJ's assessment of Klein's credibility is also problematic. The ALJ offered several reasons for doubting Klein, including finding inconsistencies between her daily activities and her alleged symptoms, lack of medical evidence to support some of her complaints, her work history, and her history of treatment. As with the ALJ's rejection of Dr. Newman's opinion, much of the ALJ's credibility finding rests on plainly erroneous factual findings.

---

[1] At the conclusion of counsel's questioning of the vocational expert, the ALJ embarked on a soliloquy in which he flippantly suggested that Dr. Newman's report was somehow incomplete because she did not account for an 8-hour workday. The ALJ stated that "the problem . . . I have with doctor's that give an opinion like that is, I'd like to know what they expect the claimant . . . is doing the rest of the time. They don't tell us. What are they doing the rest of the time, running?" When Klein's attorney suggested that a reasonable inference would be that Dr. Newman believed that Klein would require rest during an 8-hour workday, the ALJ cursorily dismissed the suggestion. (Tr. 48-49). Quite frankly, the ALJ's interpretation of what reasonable inferences may be drawn from Dr. Newman's assessment is absurd. More disturbing is the tenor of his comments. At best, the ALJ's discussion is callous. At worst, it suggests a inclination to prejudge any and all claims of disability based on nothing more than frustration with the form of a doctor's report. If the ALJ had genuine concerns about whether Dr. Newman believed Klein could not sit or stand for more than six hours total in a work day, he could have contacted her for clarification. 20 C.F.R. § 404.1527(c)(3); *see also Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (noting that ALJ has a duty to develop the record) (collecting cases).

10

For example, the ALJ noted that Klein's complaints of disabling pain were inconsistent with her daily activities, specifically noting her ability to "walk without assistance, drive an automobile, work out at a gym, and perform some household chores." At a minimum, the ALJ mischaracterizes the record. Klein testified that she used a cane to walk when in public and only walked without a cane in her home because she used the walls to support herself. (Tr. 42). Further, Dr. Newman's records are littered with references to the frequency with which Klein's knee gives way. To suggest that she could "walk without assistance" simply is not supported by substantial evidence. Similarly, although Klein testified that she participated in some household chores, she testified that her husband did the bulk of those chores because she was unable to lift or carry most objects. Indeed, Klein testified that her grasp was sufficiently weak that she did not even take things out of an oven. Klein's description of her ability to participate in household chores is hardly inconsistent with her claims of disabling symptoms resulting from her fibromyalgia. While there is evidence in the record that Klein worked out at a gym, there also is evidence in the record, which the ALJ failed to discuss that her treating physician recommended that she work out as a way to *combat* the symptoms of her fibromyalgia. *See Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009) (noting that in making credibility determinations, an ALJ may not simply ignore evidence). Even if the ALJ's description of Klein's daily activities were accurate and complete, which it is not, an ALJ must explain perceived inconsistencies between a claimant's daily activities and the medical evidence. *Jelinek*, 662 F.3d at 812. The ALJ never explains how Klein's limited ability to perform household chores or occasionally work out is in any way inconsistent with her claim to be disabled. Indeed, there is a significant difference between being able to engage in sporadic, physical activity — some of which is therapeutic according to a treating physician — and an ability to work eight hours a day, five days

a week. *Carradine v. Barnhart*, 360 F.3d 751, 755-56 (7th Cir. 2004).

The ALJ also finds reason to doubt Klein because she testified that she suffered from blurry vision and yet "has not reported any such vision problems in the medical records." (Tr. 21). That statement, though, is plainly wrong. Dr. Newman's records reflect that Klein did report suffering from decreased night vision. (Tr. 419, 421). As noted earlier, an ALJ may not simply ignore evidence in making credibility findings. *Myles*, 582 F.3d at 676.

The ALJ discounted Klein's credibility because of her sporadic work history. An ALJ may consider a claimant's work history in making credibility determinations. 20 C.F.R. § 404.1529(c)(3); *Simila v. Astrue*, 573 F.3d 503, 520 (7th Cir. 2009). Klein, however, testified that she had been terminated from a waitress position because she dropped too many things, a claim supported by Dr. Newman's treatment records. *See Schall v. Apfel*, 134 F.3d 496, 502 (2nd Cir. 1998) (noting that ALJ should explore the reasons for a claimant's absence from the work place to determine whether they are consistent with a claim for disability).

Finally, the ALJ found Klein less credible because of her treatment history. Specifically, he noted that Klein informed her physical therapist that she wished to return to "full effort sports" if she recovered from her knee injury and that aspirational desire was inconsistent with someone suffering from "disabling fibromyalgia allegedly for twenty years." Of course, Klein did not allege that she had suffered disabling fibromyalgia for twenty years, she alleged that it had become disabling as of November 1, 2007.[2] In any event, the mere fact that Klein hoped that her condition might one day

---

[2] The government suggests that Klein was "mud wrestling during the time she alleged she was disabled." (Def. Mem. at 12). That statement, like many of the ALJ's characterizations of the evidence, is plainly false. Klein was injured mud wrestling in July 2007, several months before she alleged she became disabled.

allow her to participate in sports is not a good reason to find her not credible, at least without further evidence that she might actually make real her aspiration.

While the ALJ is in the best position to evaluate the claimant's credibility, the ALJ must consider the entire case record and give specific reasons for the weight given to the claimant's statements. *Simila*, 573 F.3d at 517. He did not. As noted earlier, the ALJ routinely ignored pieces of evidence that undermine or contradict his credibility determination. On remand, the ALJ must fully discuss the evidence and build a logical bridge to any credibility determination that is made.

In short, the ALJ's opinion is riddled with factual errors and omissions. The ALJ builds no logical bridge explaining his discounting of Dr. Newman's opinion, fails to articulate which parts of Dr. Newman's opinion he was discounting, and bases his credibility determination on an inaccurate and misleading description of the record. The Court VACATES the opinion of the ALJ and REMANDS the case to the Social Security Administration for further proceedings consistent with this Order.

IT IS SO ORDERED.


_2 / 27 / 12_
Dated

*Wm. J. Hibbler*
Hon. William J. Hibbler
U.S. District Court